825 A.2d 1215 (2003)
361 N.J. Super. 488
BOARD OF EDUCATION OF the WEST WINDSOR-PLAINSBORO REGIONAL SCHOOL DISTRICT, MERCER COUNTY, Petitioner-Respondent,
v.
BOARD OF EDUCATION OF the TOWNSHIP OF DELRAN, Burlington County, Respondent-Appellant,
Board of Education of the Township of Nutley, Essex County, Petitioner-Respondent,
v.
Board of Education of the Township of Delran, Burlington County, Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 20, 2003.
Decided July 1, 2003.
*1216 Parker, McKay & Criscuolo, Cherry Hill, for respondent West Windsor-Plainsboro Regional Board of Education (James F. Schwerin, Lawrenceville, on the brief).
John T. Barbour, Maple Shade, for appellant Delran Board of Education.
Gaccione, Pomaco & Beck, Belleville, for respondent Board of Education of the Township of Nutley (Mark A. Wenczel, Bloomfield, on the brief).
Peter C. Harvey, Acting Attorney General, for respondent State Board of Education (Patrick DeAlmeida, Deputy Attorney General, of counsel; Kathleen Asher, Deputy Attorney General, on the statement in lieu of brief).
Before Judges STERN, COLLESTER and ALLEY.
The opinion of the court was delivered by ALLEY, J.A.D.
Enacted in 1990 and amended in 1997, the federal Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400, et seq. ("IDEA"), sets forth a Congressional finding concerning "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities[,]" and affirms that "[i]mproving educational results is an essential element" of federal policy. 20 U.S.C.A. § 1400(c)(1). Moreover, one of the statute's purposes is to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. § 1400(d)(1)(A).
This appeal focuses on the financial responsibility entailed in furnishing one of those "related services," transportation, which as will appear, is a matter of state law. In particular, it presents for our resolution the issue of which school district must pay the transportation costs for a child with autism, when the child lives in a group home but attends school in another school district, and the parents reside in still another district. We review the action of the State Board of Education which, in consolidated cases involving two children with autism placed in the same group home, ruled that the responsible district is Delran Township, where the group home is located. Delran appeals, and we reverse.
The background of the proceedings is this. In September 1998, the Nutley Township Board of Education filed a petition with the Commissioner of Education seeking an order compelling the Delran Township Board of Education to pay the transportation costs for an autistic student, S.M., born in July 1982, who lived in a group home in Delran but attended a special school in Ocean Township. S.M.'s parent resided in Nutley.
The next month the Board of Education of the West Windsor-Plainsboro Regional School District ("WWP") filed a similar petition, seeking the same relief as to K.H., the autistic child of parents residing in the WWP district. K.H., who was born in December 1977, lived in the Delran group home and attended a special school in Princeton.
After both matters were consolidated for hearing in the Office of Administrative Law, on cross-motions for summary decision an administrative law judge ("ALJ") granted Delran's motion for summary dismissal of the petitions. The ALJ concluded *1217 that Delran was not responsible for paying the transportation costs for the two students living in the group home in its district, and that this responsibility belonged to the districts of residence of the students' parents, Nutley and WWP.
After Nutley and WWP filed exceptions with the Commissioner of Education, in a decision dated September 5, 2000, the Commissioner rejected the ALJ's recommendation and determined that Delran, as the district where the students' group home was located, was required to pay the students' transportation costs.
Delran appealed to the State Board of Education, which affirmed the Commissioner on April 8, 2002. The State Board took that action even though it disagreed with the Commissioner's conclusion, characterizing the conclusion as "inequitable" and based on outdated advice from the Attorney General, but concluding that the Board was "required to follow [the Attorney General's] advice."
Since about 1990, the Division of Developmental Disabilities ("DDD") within the Department of Human Services ("DHS") has been responsible for finding residential placements for both K.H. and S.M. In 1994 DDD moved both students to a group home in Delran, the Durand Academy Fox Chase Group Home. Until June 30, 1995, both received their educational services at the Center for Autistic Children in Willingboro, about two miles from Delran.
When the Willingboro center closed on June 30, 1995, the Office of Education within DHS arranged for K.H. to attend the Eden Institute in Princeton and for S.M. to attend the Search Day Program in Ocean Township. The students continued to live at the Delran group home, and the Office of Education paid for their tuition for and transportation to their respective day programs through the 1997-98 school year.
After receiving an opinion from its counsel in August 1998, Delran advised Nutley and WWP that it would not pay for transportation. This resulted in the present proceeding.[1]
In its April 2002 decision, the State Board noted that in 1984 the Attorney General had issued a letter, referred to as administrative agency advice ("1984 AAA"), addressing the issue of responsibility for transportation costs. The State Board questioned the viability of that advice under current law and circumstances:
[I]t has become increasingly clear to us that it is inequitable to continue to impose the costs at issue exclusively on those school districts in which group homes happen to be located. This is especially true given that the number of children placed in such homes today is far greater than in 1984 and that the transportation costs are considerable because the educational placements of these children may be quite distant from the group home. Moreover, we cannot ignore that in contrast to the funding system in place in 1984 and to which the DAG specifically pointed in her 1984 memorandum, school districts are no longer entitled to be reimbursed by State aid for 90% of the costs of transporting these children from the group homes to their educational placements.
Nonetheless, the State Board considered itself bound by the 1984 AAA, which a *1218 Deputy Attorney General had issued in the name of then-Attorney General Irwin Kimmelman. The decision went on to state that
although the State Board of Education disagrees with the most recent advice from the Attorney General's Office sustaining the continued validity of the AAA provided to the Commissioner in 1984, the State Board, like the Commissioner, is required to follow that advice. We are therefore compelled to affirm the decision of the Commissioner in this matter.
Thus, the State Board disavowed its own analysis in the interest of following the 1984 AAA, even though the State Board expressly disagreed with the advice.
We preface our analysis by noting that the Attorney General's 1984 AAA sent to the agency in this matter was not a binding opinion, nor was it an administrative determination, but advice by the Attorney General to a client, which the client could accept or reject.[2] In the school law context, the State Board of Education is the ultimate administrative interpreter, subject to the courts, of the requirements of pertinent statutes and regulations. Probst v. Bd. of Educ., 127 N.J. 518, 529, 606 A.2d 345 (1992). Because of its legislative charge, the State Board's decision on that question is entitled to great deference from us. See Board of Educ. v. Kraft, 139 N.J. 597, 603, 656 A.2d 430 (1995); Probst, supra, 127 N.J. at 529, 606 A.2d 345. When an agency's statutory construction is based on an opinion (formal or informal) by the Attorney General, we must give weight to that opinion. Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 70, 389 A.2d 465 (1978); State v. Wallach, 296 N.J.Super. 93, 98, 685 A.2d 1379 (Law Div.1996).[3]
We extend the utmost deference to the advice on which the State Board's conclusions were based. Nevertheless, in light of the extensive changes in the law during the almost twenty years since the advice was first rendered in 1984, such as Congress's adoption of IDEA and New Jersey's own adoption of additional legislation concerning special education and related services, we are of the view that those conclusions and that advice need not be followed. Accordingly, we turn to the statutory construction issue presented by this appeal without being bound by any need to extend special deference to the State Board's decision and the 1984 AAA.
*1219 In her initial decision of March 2000, the ALJ correctly observed that IDEA
assures that all children with disabilities are to be afforded a free and appropriate public education. This has been held to mean personalized instruction and related services to permit the child to benefit educationally from the instruction. Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Lascari v. Bd. of Educ., 116 N.J. 30, 560 A.2d 1180 (1989). 20 U.S.C.A. § 1401(18) defines the term "free appropriate public education" to mean "special education and related services[.]" The federal regulations define transportation as a related service, where that transportation is required to assist a child with a disability to benefit from education. 30 C.F.R. 300.16(b)(4).
"Transportation" includes:
i. Travel to and from school and between schools;
ii. Travel in and around school buildings; and
iii. Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

Ibid. The IDEA, however, does not base its determinations of a handicap[ped] child's rights on domicile; how the free appropriate public education funded is a matter of State law.
With respect to State law, we examine New Jersey's statutory framework for these services. The first arguably relevant provision is N.J.S.A. 30:4C-26, revised in 1979 as part of the State Facilities Education Act of 1979, L. 1979, c. 207, which authorizes the Division of Youth and Family Services ("DYFS") to place eligible students in group or foster homes or in other appropriate institutions. N.J.S.A. 30:4C-26a. The following two subsections of that provision pertain to this appeal:
b. Whenever the Division of Youth and Family Services shall place any child, as provided by this section, in any municipality and county of this State, the child shall be deemed a resident of such municipality and county for all purposes except school funding, and he shall be entitled to the use and benefit of all health, recreational, vocational and other facilities of such municipality and county in the same manner and extent as any other child living in such municipality and county.
c. Whenever the Division of Youth and Family Services shall place any child, as provided by this section, in any school district, the child shall be entitled to the educational benefits of such district; provided, however, that the district of residence, as determined by the Commissioner of Education pursuant to law, shall be responsible for paying tuition for such child to the district in which he is placed.

[N.J.S.A. 30:4C-26b & c (emphasis added).]
The Legislature enacted N.J.S.A. 30:4C-26 in 1951. At the time, the Act vested placement powers in a predecessor of DYFS, the State Board of Child Welfare, later named the Bureau of Children's Services, and it provided that a child placed by that board would be deemed a resident, "for all purposes," of the municipality and county of placement. L. 1951, c. 138, § 26. An amendment in 1974 reposed the placement power in DYFS, and for the first time the section expressly included a "group home" as one of the possible placement options. L. 1974, c. 178, § 26.
The statute as amended in 1979, however, and as quoted above, revised the residence clause to read that a child should be deemed a resident of the locality of the *1220 placement, "for all purposes except school funding." L. 1979, c. 207, § 26 (the current N.J.S.A. 30:4C-26b). The amendment also added the current subsection c, granting to the child the "educational benefits" of the district of placement, while holding the "district of residence" responsible for paying "tuition" to the district of placement. N.J.S.A. 30:4C-26c.
The 1979 amendments further included a new section, part of the State Facilities Education Act of 1979, which defined "district of residence" for "school funding purposes," that is, as used in N.J.S.A. 30:4C-26c. L. 1979, c. 207, § 19. The new section defined "district of residence" of a group home student as being the district in which the student's parent or guardian, with whom the child lived prior to the child's "most recent admission to a State facility or most recent placement by a State agency[,]" resides. N.J.S.A. 18A:7B-12b.
We further note that the Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 to -32, adopted in 1979, applies to the category of children and adults known as "developmentally disabled." L. 1977, c. 82. Before 1985 the Act was administered by a division within DHS called the Division of Mental Retardation ("DMR"). N.J.S.A. 30:6D-28. In a 1985 amendment, the DMR was replaced by the current DDD. N.J.S.A. 30:6D-28; L. 1985, c. 145, § 6.
The Developmentally Disabled Rights Act includes "autism" within its definition of "developmental disability," N.J.S.A. 30:6D-3a(5), and authorizes DDD to provide certain services for such disabled persons. These include "special living arrangements," "education," and "transportation services necessary to assure delivery of services to persons with developmental disabilities[.]" N.J.S.A. 30:6D-3b. (defining "services"); N.J.S.A. 30:6D-27(a) (authorizing the DDD director to provide these services). See also N.J.S.A. 30:6D-25f (defining "services for developmentally disabled persons" to include "transportation services"). Further, the developmentally disabled are entitled to a "thorough and efficient education." N.J.S.A. 30:6D-5c.
We disagree with the contention that a particular portion of the ALJ's opinion is insupportable. We refer to the ALJ's conclusion that N.J.S.A. 30:4C-26 applied to this case because in her view the DDD was DYFS's successor with respect to placing developmentally disabled children. She reasoned that DDD did not exist in 1979 when N.J.S.A. 30:4C-26 was amended to its current version; it did not come into being until 1985. Thus, she concluded:
Accordingly, prior to 1985, the agency which would have been responsible for placing children such as those in the within case in group homes would have been the Division of Youth and Family Services. Notwithstanding the fact that N.J.S.A. 30:4C-26 was not amended after 1985 to include placements made by the Division of Developmental Disabilities, I CONCLUDE that the entire statutory scheme set forth in Chapter 207 of the Laws of 1979 is applicable to determinations for school funding purposes to children placed in group homes by the Division of Developmental Disabilities.
As we understand it, prior to the inception of DDD's responsibilities in this field, DYFS handled the placement of children and DMR handled the placement of adults. Thus, DDD succeeded to those respective responsibilities of both DYFS and DMR. With respect to the transfer of functions from DMR, the 1985 DDD statute provided: "All of the functions, powers and duties of the Division of Mental Retardation in the Department of Human Services and of the director of that division are transferred to the Division of Developmental Disabilities." N.J.S.A. 30:6D-28.
*1221 Accordingly, under current law concerning responsibilities with respect to the developmentally disabled, the Legislature has created DDD to administer public services for that special category of children and adults. We also note the Act governing education of "handicapped children," N.J.S.A. 18A:46-1 to -46. Pursuant to an implementing regulation, autistic children qualify for services under that Act (N.J.A.C. 6A:14-3.5(c)2), and included among the services is "transportation." N.J.A.C. 6A:14-1.3 (defining "related services"). The "district board of education" is defined as "the school district of residence" and must provide special education programs including "related services" such as transportation. N.J.A.C. 6A:14.1.3.
The Act itself applies to handicapped students "residing in the district," and it expressly excludes children who, like S.M. and K.H., board outside the parents' district: "For the purposes of this act, a child who boards at a school in a district in which his parents do not maintain a residence shall not be considered a resident of the district." N.J.S.A. 18A:46-6. In other words, within the meaning of this Act, S.M. and K.H. would not be deemed residents of Delran; their district of residence would be Nutley and WWP respectively. That result is consistent with N.J.S.A. 18A:7B-12, which also identifies "the present district of residence of the parent or guardian with whom the child lived prior" to the most recent out-of-home placement as the "district of residence" for school funding purposes.
We also find pertinent, as did the ALJ's decision, a regulation under the Act concerning education of handicapped children. At the time of the decision below this regulation appeared at N.J.A.C. 6A:14-3.9(a)7.[4] It read in pertinent part as follows:
7. Transportation shall be provided as follows:
i. The district board of education shall provide transportation as required in the IEP.[5] Such services shall include special transportation equipment, transportation aides and special arrangements for other assistance to and from and in and around the school;
ii. When out-of-district placement for education reasons is made by a district board of education, transportation shall be provided consistent with the school calendar of the receiving school.

[N.J.A.C. 6A:14-3.9(a)7.]
Plainly, the "district board of education" under this Act and this regulatory chapter cannot be the district where the child boards. That is the express directive of N.J.S.A. 18A:46-6, quoted above. Hence the district board of education must be the district where the parents reside, as provided by N.J.S.A. 18A:7B-12b. Necessarily, *1222 then, WWP and Nutley had to "provide transportation" under N.J.A.C. 6A:14-3.9(a)7.[6]
Another statute, the Comprehensive Educational Improvement and Financing Act of 1996 ("CEIFA"), N.J.S.A. 18A:7F-1 to -34, authorizes state transportation aid only to the district where a group home pupil's parents live. Thus, only WWP and Nutley are entitled to state aid for the transportation costs at issue here. In our view, the Commissioner and 1984 AAA were incorrect in concluding that the district in which a group home is located would be able to mitigate the transportation expenses for these students by receiving state aid under CEIFA. By reason of changes in the law, moreover, the similar conclusion in the 1984 AAA no longer applies. CEIFA counts enrollment based on pupils residing in a district plus, among others, those for whom the "district of residence" pays tuition for pupils enrolled in private schools, or who have been placed in a state facility. N.J.S.A. 18A:7F-3 (defining "resident enrollment").
Additionally, transportation aid is calculated under N.J.S.A. 18A:7F-25 according to a formula that includes, among other things, "the total number of special education pupils eligible for transportation pursuant to N.J.S.[A.] 18A:46-23 [transportation for handicapped pupils] with special transportation requirements who are resident in the district as of the last school day prior to October 16 of the prebudget year[.]" N.J.S.A. 18A:7F-25. In our view, a special education pupil cannot be a "resident in the district" where his or her group home is located because of N.J.S.A. 18A:7F-3 (discussed above) and also because of 18A:7B-12b quoted above, which defines "district of residence" for school funding purposes (that is, for CEIFA purposes) as the parents' district.
Moreover, a CEIFA regulation provides direct support for this reading of the statute:
The district of residence for school funding purposes shall be determined according to the following criteria:
1. The "present district of residence" of a child in a residential State facility defined in N.J.S.A. 18A:7D-3 [now N.J.S.A. 18A:7F-3] and referred to in paragraph one of N.J.S.A. 18A:7B-12(b) shall mean the New Jersey district of residence of the child's parent(s) or guardian(s) as of the last school day prior to October 16.
2. The "present district of residence" of a child placed by a State agency in a group home, private school or out-of-State facility also referred to in paragraph one of N.J.S.A. 18A:7B-12(b) shall mean the New Jersey district of residence of the child's parent(s) or guardian(s) as of the date of the child's initial placement by the State agency. In subsequent school years spent in the educational placement made by the State agency, the child's "present district of residence" shall be determined in the same manner as for a child in a residential State facility as set forth in (a)1[.]
*1223 [N.J.A.C. 6:20-5.3(a) (recodified as of July 1, 2001, as N.J.A.C. 6A:23-5.2(a)).]
Thus, when provided for in a student's Individualized Education Program, transportation is an essential related service in the furnishing of mandated educational services to the disabled, services that New Jersey is committed to providing through a variety of statutes. In the statutory framework, provision is made for group homes, and also for the allocation of various costs attendant upon the provision of educational services for children with disabilities. Yet not a single New Jersey statute has allocated the responsibility for transportation costs for the students to the districts where their group homes are located.
We conclude that the Legislature never intended that N.J.S.A. 30:4C-26, or any of the foregoing statutory provisions, would decree that the transportation costs of pupils with autism who live at a group home outside their parents' district should be paid by the district where the group home is located. Rather, the DDD statute, together with the pertinent sections of the school-funding and handicapped-students laws and regulations, compel the conclusion that it is the parents' districts that should pay, a conclusion with which the State Board agreed, though it based its view on fairness rather than on statutory analysis.
We particularly disagree with the position, which was a key premise of the Commissioner's decision as to the fairness in burdening Delran with these costs, that Delran, not WWP or Nutley, is the district that oversees the students' educational program and placement, and that Delran will be able to exert some control over transportation costs by deciding where the students will attend school. This premise is not correct. As Delran observes, as the ALJ found, and as both respondents agree, Delran does not provide any educational services or exert any influence over the choice of placement. Rather, Nutley and WWP chose to provide all services and to keep the two students at the schools where they had been placed by DDD. Hence the effect of requiring Delran to pay for such transportation was to compel it to pay for transportation to sites it did not choose for students over whom it exercised no educational control.
Finally, we note the firmly established principle that "[t]he Legislature is presumed to know the law[,]" David v. Government Employees Ins. Co., 360 N.J.Super. 127, 143, 821 A.2d 564 (2003), and it is further evident that the Legislature is superior to the judiciary as a judge of the political context of its enactments. To impose on the district where a group home is located the entire transportation costs of the students living in the home, costs which the State Board's decision described as "considerable," manifestly could only make more difficult the obtaining of satisfactory locations for group homes. It would be hard to envision that a district would willingly take on the substantial transportation costs with respect to students living in a group home, at least absent an express Legislative directive, which is lacking here.
The Legislature has shown a strong commitment to the provision of adequate educational and treatment services for students in the position of S.M. and K.H. We cannot presume that the Legislature intended to make the provision of those services even more burdensome by imposing, on the district where a group home is located, all the transportation costs for the students who board there. While we do not say that the Legislature necessarily could not impose such a burden, we are unwilling to infer a legislative intent to do so in the absence of a more specific directive *1224 in the statutory language than we find in the statutes pertinent to this case.
The State Board's decision is reversed because the applicable statutory and regulatory provisions show that neither WWP nor Nutley is entitled to be relieved of responsibility for paying these transportation costs, and that these costs are not the responsibility of Delran.
Reversed.
NOTES
[1] WWP represents to us in its brief that K.H. "has aged out" of public school and that it seeks "only reimbursement for past expenses," which it estimates in its brief as being "under $50,000." WWP's petition alleged that it was paying transportation costs of $218.30 per day during the 1998-99 school year, plus $5949 for the summer program. Nutley alleged that its expenditure was $277.50 per day. It appears that Nutley is still paying for the transportation of S.M., who will not turn twenty-one until July 2003.
[2] Formal Attorney General opinions "are binding on most administrative agencies since the Attorney General is statutorily empowered to interpret statutes for agencies and is the sole legal advisor to State Government[]" (37 Steven L. Lefelt et al., New Jersey Practice § 2.6 (2d ed.2000)), but an informal Attorney General opinion has been described by the Attorney General as "nothing more than an internal legal memorandum[.]" Girard Acceptance Corp. v. Wallace, 76 N.J. 434, 444, 388 A.2d 582 (1978) (interpreting a statute which has been since amended). There are three kinds of Attorney General "opinions": formal, informal and memorandum. Weiner v. County of Essex, 262 N.J.Super. 270, 281 n. 2, 620 A.2d 1071 (Law Div.1992) (citing Preface to Attorney General's Opinions (1949 & 1950)). Only a "formal opinion" has precedential value, as the other two are usually limited to the particular set of facts. Ibid.
[3] Here, the administrative opinion is really not the State Board's opinion but the advice of the Attorney General. An opinion of the Attorney General, however, even when it has the status of a "formal opinion," is not controlling on an appeal from an agency decision that relied on that opinion. Boylan v. State, 222 N.J.Super. 313, 326, 536 A.2d 1283 (App. Div.1988), rev'd on other grounds, 116 N.J. 236, 561 A.2d 552 (1989), cert. denied sub nom., Ferlauto v. New Jersey, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990). Thus, while we accord respectful weight to the 1984 AAA on which the State Board based its decision, we are not bound by it.
[4] It was repealed effective January 2, 2001, and recodified as follows on January 2, 2001:

(a) Students with special needs shall be provided with transportation in accordance with N.J.S.A. 18A:39-1 et seq. and in accordance with their Individualized Education Program (IEP).
1. The district board of education shall provide transportation as required in the IEP. Such services may include, but are not limited to, special transportation equipment, transportation aides and special arrangements for other assistance to and from the school.
2. When an out-of-district placement for educational reasons is made by a resident district board of education, transportation shall be provided consistent with the school calendar of the receiving school[.]
[N.J.A.C. 6A:27-5.1.]
[5] "The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with Section 1414(d) of this title." 20 U.S.C.A. § 1401(11).
[6] When the State Board re-codified these regulations effective January 2, 2001, it added a new one, entitled "Students residing in group homes": "Transportation for students living in group homes shall be the responsibility of the resident district board of education in which the group home is located." N.J.A.C. 6A:27-6.3. That regulation does not apply here, given its effective date, and it may have been prompted by the perceived gap identified by this case. While we do not consider the validity of this regulation, we note that arguably it may conflict with the statute, reviewed above, that makes the parents' district the "district of residence" for purposes of fixing responsibility for services for autistic children.