DeALMEIDA, P.J.T.C.
This is the court’s opinion with respect to the parties’ cross-motions for summary judgment. Plaintiff, a vehicle leasing company, raises several issues relating to the Director, Division of Taxation’s determination of plaintiffs Corporation Business Tax (“CBT”) obligations for its fiscal years 2003 through 2006. For the reasons explained more fully below, the court concludes that: (1) New Jersey’s decoupling from the federal bonus depreciation statute enacted in the wake of the events of September 11, 2001, 26 U.S.C.A. § 168, was effective beginning with plaintiffs fiscal year commencing October 1, 2002 and applies to vehicles purchased after September 10, 2001, even if they were purchased prior to the start of that fiscal year; (2) the holding in Moroney v. Director, Div. of Taxation, 376 N.J.Super. 1, 868 A.2d 1132 (App.Div.2005), concerning adjustments to federal basis when determining gain from the sale of property for Gross Income Tax (“GIT”) purposes, applies to the calculation of plaintiffs “entire net income” from the sale of its property under the CBT Act; and (3) the Director’s removal under the Throw-Out Rule, N.J.S.A. 54:10A-6(B)(6), as amended by L. 2002, c. 40, § 8, of plaintiffs receipts sourced to Nevada, South Dakota, and Wyoming from the denominator of the receipts fraction used to determine plaintiffs CBT liability was erroneous. In light of these holdings, the parties are directed to submit to the court revised computations of plaintiffs CBT obligations for its fiscal years 2003 through 2006. R. 8:9-3.[1]
*100 I. Findings of Fact and Procedural History
The court makes the following findings of fact based on the submissions of the parties on their cross-motions for summary-judgment. R. 1:7-4.
A. Plaintiff’s Business Operations.
Plaintiff Toyota Motor Credit Corporation (“TMCC”) is a California corporation which operates a vehicle leasing business in New Jersey and elsewhere. In the typical TMCC lease transaction, an automotive dealer enters into a lease agreement with a consumer for a Toyota vehicle. TMCC thereafter purchases the leased vehicle from the dealer, the dealer assigns the lease agreement to TMCC, and TMCC collects the lease payments from the consumer. After completion of the lease, TMCC sells the used vehicle.
For federal income tax purposes, TMCC deducts the cost of its leased vehicles during the time that it owns the vehicles. This cost recovery is effectuated through depreciation deductions from TMCC’s income. When TMCC disposes of a vehicle at the end of a lease it realizes gain under I.R.C. § 1001. To determine TMCC’s gain, the basis of the vehicle is adjusted downward for federal tax purposes to account for the depreciation deductions taken by TMCC. The federal adjusted basis is calculated by deducting from the cost of the vehicle the cumulative amount of allowed or allowable depreciation deductions that were available to the taxpayer during ownership of the property. See Hinckley v. Comm’r of Internal Revenue, 410 F.2d 937, 940 (8th Cir.1969)(requiring reduction of taxpayer’s basis in property by the amount allowed each year, even though taxpayer received no tax benefit because he failed to claim deduction); Comm’r of Internal Revenue v. Kennedy Laundry Co., 133 F.2d 660, 662 (7th Cir.)(same), cert. denied, 319 U.S. 770, 63 S.Ct. 1434, 87 L.Ed. 1718 (1943). *101 The downward adjustment of the basis has the effect of increasing TMCC’s gain at the time of sale. This is so because TMCC’s gain on each transaction is the excess of the proceeds on the transaction over the adjusted basis for the property sold. As a result, at the time that TMCC’s vehicles are sold, the lower basis provides for “depreciation recovery” by increasing the gain realized from the sale by the amount of the used and allowable depreciation. I.R.C. § 1001.
B. Calculation of Gain from the Sale of Vehicles.
TMCC raises two issues with respect to the role that depreciation deductions play in the calculation of its gain from the sale of vehicles. First, TMCC argues that the Director incorrectly interpreted the interplay of the federal “bonus depreciation” enacted by Congress in 2002 and New Jersey’s subsequent legislative decoupling from the federal law. The question presented is one of timing. TMCC contends that the decoupling took effect beginning with TMCC’s fiscal year commencing October 1, 2002 and applies to all property purchased after September 10, 2001, even if purchased prior to the start of that fiscal year. While the Director agrees that the decoupling took effect with TMCC’s fiscal year commencing October 1, 2002, the Director takes the position that decoupling applies to vehicles purchased by TMCC after the start of its October 1, 2002 fiscal year. Thus, the Director contends that the decoupling from federal bonus depreciation does not apply to vehicles purchased by TMCC after September 10, 2001 and prior to October 1, 2002.
Second, TMCC argues that pursuant to the holding in Moroney, supra, TMCC is entitled to depart from its federal adjusted basis when calculating gain. In effect, TMCC contends that New Jersey’s limitation on carrying forward net operating losses during the years in question, including depreciation deductions, prevented TMCC from benefitting under State law from approximately $2 billion in depreciation deductions available to TMCC under federal law for the years in question. As a result, TMCC contends, the “New Jersey basis” for its vehicles should not be the federal adjusted basis for the vehicles because the federal adjusted basis *102 is adjusted to account for depreciation deductions not recognized by New Jersey. If adopted, this approach, which has been recognized for GIT purposes, would raise the basis for TMCC’s vehicles and reduce its entire net income subject to CBT. The facts relating to the two depreciation issues are addressed in turn below.
1. Decoupling from Federal Bonus Depreciation.
In 2002, in response to the events of September 11, 2001, Congress added subsection (k) to Section 168 of the Internal Revenue Code. P.L. 107-147. Subsection (k), the so-called “bonus depreciation” provision, applies to property acquired after September 10, 2001. This provision allowed TMCC to take an additional federal deduction equal to 30% of the cost of a leased vehicle in the year the vehicle was put into service. In turn, regular depreciation is computed on the remaining 70% over the course of TMCC’s ownership of the vehicle. I.R.C. § 168(k)(1)(A). The federal statute has the effect of reducing TMCC’s taxable income during the first year of its ownership of the vehicles, but also accelerating the reduction of the basis in the vehicles, which, in turn, increases TMCC’s gain at the time of sale.
Although New Jersey had previously followed the depreciation deduction provisions of federal law, the Legislature decoupled from subsection (k) through enactment of the Business Tax Reform Act, L. 2002, c. 40 on July 2, 2002. Section 3 of L. 2002, c. 40 amended N.J.S.A. 54:10A-4(k), the provision that defines how an entity’s “entire net income” is calculated for CBT purposes. Under the amendment “entire net income”
mean[s] total net income from all sources, whether within or without the United States, and shall include the gain derived from the employment of capital or labor, or from both combined, as well as profit gained through a sale or conversion of capital assets.
For purposes of this act, the amount of a taxpayer’s entire net income shall be deemed prima facie to be equal in amount to the taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report ... to the United States Treasury Department for the purpose of computing its federal income tax, provided however, that in the determination of such entire net income,
*103 (12)(A) Notwithstanding the provisions of subsection (k) of section 168 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.168 ... for property acquired after September 10, 2001 and before September 11, 2004, the depreciation deduction otherwise allowed pursuant to section 167 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.167, shall be determined pursuant to the requirements and limitations of section 168 of .the federal Internal Revenue Code of 1986, 26 U.S.C. s.168____as if that subsection (k) [was] not in effect.
(B) The director shall prescribe the rules and regulations necessary to carry out the provisions of this paragraph, including, among others, those for determining the adjusted basis of the acquired property for the purposes of the “Corporation Business Tax Act (1945)”, P.L.1945, c. 162.
[L. 2002, c. 40, § 3.]
According to Section 33 of L. 2002, c. 40, “[t]his act shall take effect immediately and apply to privilege periods and taxable years beginning on or after January 1,2002____”
On February 27, 2003, the Director promulgated a regulation implementing the bonus depreciation decoupling amendment to N.J.S.A. 54:10A-4(k). 35 N.J.R. 1573. The regulation provides as follows:
(a) “Taxable income before net operating loss deduction and special deductions,” hereinafter referred to as Federal taxable income, is the starting point in the computation of the entire net income. After determining Federal taxable income, it must be adjusted as follows:
* * *
2. Deduct from Federal taxable income:
* $ *
iv. In any privilege period or taxable year beginning on or after January 1, 2002, with respect to property acqufred on or after January 1, 2002 and before September 11, 2004, any depreciation which was deducted in arriving at Federal taxable income and which was determined in accordance with Sections 168(k) ... of the Federal Internal Revenue Code. Assets acquired before January 1, 2002 for which such depreciation was taken will continue for the entire life of the asset to follow Federal depreciation. Assets acquired in periods beginning before January 1,2002 will continue to follow Federal depreciation even if the asset itself was acquired after January 1, 2002 but during such fiscal year. Upon early retirement a basis adjustment will be required to equalize Federal and State basis.
Example: Federal bonus depreciation with respect to an asset acquired February 1, 2002 by a corporation which is a calendar year corporation will be disallowed for the corporation when filing its CBT-100 for 2002.
[N.J.A.C. 18:7-5.2(a)(2)(iv).]
TMCC’s fiscal year 2002 runs from October 1, 2001 through September 30, 2002. During TMCC’s fiscal year 2002, TMCC placed leased vehicles in service after September 10, 2001. Some *104 of the vehicles were placed into service prior to January 1, 2002 and some after that date. The following represents the period at issue here:
[[Image here]]
TMCC takes the position that decoupling commences with TMCC’s fiscal year starting October 1, 2002, the first TMCC fiscal year commencing after January 1, 2002, and applies to any property it purchased after September 10, 2001, even if purchased prior to the fiscal year starting October 1, 2002. While the Director agrees that decoupling commences with TMCC’s fiscal year starting October 1, 2002, he takes the position that decoupling applies only to vehicles purchased during that fiscal year and would not apply to vehicles purchased by TMCC between September 10, 2001 and October 1, 2002.
2. Application ofMoroney.
For periods prior to fiscal year 2003, TMCC had been allowed depreciation deductions of $2,041,189,944 in excess of what was necessary to reduce TMCC’s entire net income to zero. Thus deductions, therefore, increased TMCC’s net operating losses by $2,041,189,944. Because of limitations in the CBT Act, TMCC could not use these losses for New Jersey CBT purposes in fiscal years 2003 and 2004. N.J.S.A. 54:10A-4(k)(6)(E)(2003)(prohibiting loss carryovers for fiscal years 2003 and 2004).
However, for federal tax purposes, during TMCC’s fiscal year 2003 and 2004, TMCC disposed of vehicles and recognized depreciation recovery gain of $484 million and $1,278 billion, respectively. That depreciation recovery gain was attributable to the excess depreciation deductions of $2,041,189,944 which provided no benefit to TMCC for New Jersey CBT purposes.
TMCC initially used its federal adjusted basis to determine gains for CBT purposes for fiscal years 2003 and 2004. -Relying on the holding in Moroney, supra, TMCC subsequently amended *105 its CBT returns for fiscal years 2003 and 2004 so that the gains of $484 million and $1,278 billion, respectively, would not be included in TMCC’s entire net income for purposes of determining its CBT obligations for those fiscal years. TMCC takes the position that it is entitled to increase its basis in the vehicles it sold during those fiscal years by the amount of the depreciation that was unused for CBT purposes. According to TMCC, to do otherwise would result in CBT being imposed on “phantom income” attributable to adjustments in the federal basis of TMCC’s property by virtue of federal depreciation deductions which were of no benefit to TMCC in New Jersey.
The Division rejected TMCC’s fiscal year 2003 and 2004 amended CBT returns. The Director determined that the holding in Moroney, which would allow such adjustments to the federal basis of a taxpayer’s property for GIT purposes, is not applicable when calculating CBT obligations.
C. Throw-Out of TMCC’s Foreign State Receipts.
Under the CBT Act, a three-factor formula is applied to determine what portion of a foreign corporation’s income is subject to tax by New Jersey. This apportionment formula includes a receipts fraction. The numerator of the receipts fraction includes the taxpayer’s New Jersey receipts. The denominator of the receipts fraction includes the taxpayer’s worldwide receipts.
At issue here is N.J.S.A. 54:10A-6(B)(6), as amended by L. 2002, c. 40, § 8, the so-called “Throw-Out Rule.” It is called the Throw-Out Rule because it requires that certain receipts realized by the taxpayer in States other than New Jersey be removed or “thrown-out” of the denominator of the receipts fraction. The removal of receipts from the denominator of the fraction has the effect of increasing the percentage of the taxpayer’s receipts subject to tax by New Jersey.
The Division excluded receipts from the denominator of TMCC’s receipts fraction as follows:
*106 FYE 2003 FYE 2004 FYE 2005 FYE 2006
Nevada $25,663,175 $51,755,123 $56,641,671 $38,643,344
South Dakota $ 1,917,015 $ 3,579,924 $ 3,713,466 $ 3,971,179
Wyoming $ 1,986,997 $ 3,705,123 $ 5,979,599 $ 2,551,189
TMCC has sufficient nexus with each of these States for those States to impose a corporate income or business activities tax. TMCC has significant amounts of both property (leased vehicles) and payroll (compensation paid to TMCC employees) in each of these States. For each of these fiscal years, TMCC paid taxes to Nevada on lease receipts pursuant to Section 372.105 of Title 32 of Nevada’s statutes. South Dakota and Wyoming do not impose a tax on corporate income or business activities.
TMCC challenges the Director’s application of the Throw-Out Rule to TMCC’s Nevada, South Dakota and Wyoming receipts when apportioning TMCC’s income for CBT purposes.[2]
D. Administrative Proceedings.
It is not necessary for the purposes of this opinion to provide extensive details with respect to what transpired between the parties at the Division of Taxation. It will suffice to note that TMCC established jurisdiction in this court to review final determinations of the Director either assessing CBT against TMCC or denying the taxpayer’s request for a refund of CBT. The Final Determination before the court assesses in excess of $7.1 million in CBT, penalties and interest against TMCC and rejects TMCC’s request for an approximately $4.5 million refund of CBT.
The parties agree that unless the Director prevails on all claims before the court, a re-computation of TMCC’s CBT obligations for *107 the relevant tax years will be necessary once the court issues its decision.
II. Conclusions of Law
Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court established the standard for summary judgment as follows:
[Wjhen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
“The express import of the Brill decision was to ‘encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.’ ” Township of Howell v. Monmouth County Bd. of Taxation, 18 N.J.Tax 149, 153 (Tax 1999)(quoting Brill, supra, 142 N.J. at 541, 666 A.2d 146). The court concludes that this matter is ripe for decision by summary judgment. There are no material facts in dispute between the parties relevant to TMCC’s CBT obligations for the relevant fiscal years. The court is presented with pure questions of statutory interpretation which can be determined by application of the law to the undisputed facts.
The court’s analysis is influenced by the familiar principle that the Director’s interpretation of tax statutes is entitled to a presumption of validity. “Courts have recognized the Director’s expertise in the highly specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997)(citing Metromedia, Inc v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984)). The scope of judicial review of the Director’s decision with respect to the imposition of a tax “is limited.” Quest Diagnostics, Inc. v. *108 Director, Div. of Taxation, 387 N.J.Super. 104, 109, 903 A.2d 442 (App.Div.), certif. denied, 188 N.J. 577, 911 A.2d 69 (2006). The Supreme Court has directed the courts to accord “great respect” to the Director’s application of tax statutes, “so long as it is not plainly unreasonable.” Metromedia, supra, 97 N.J. at 327, 478 A.2d 742. See also GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993)(“Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.”). However, judicial deference is not absolute. An administrative agency’s interpretation that is plainly at odds with a statute will not be upheld. See Oberhand v. Director, Div. of Taxation, 193 N.J. 558, 568, 940 A.2d 1202 (2008)(citing GE Solid State, supra, 132 N.J. at 306, 625 A.2d 468); Advo, Inc. v. Director, Div. of Taxation, 25 N.J.Tax 504, 511 (Tax 2010).
A. New Jersey’s Decoupling from Federal Bonus Depreciation.
TMCC’s argument with respect to the timing of New Jersey’s legislative decoupling form the federal bonus depreciation provision hinges on the meaning of L. 2002, c. 40, § 3, which amended N.J.S.A. 54:10A-4(k), and L. 2002, c. 40, § 33, which provided the effective date of the amendment. Analysis of TMCC’s argument begins with fundamental legal maxims. Statutory construction begins with the statute’s plain language. Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992). “A statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one interpretation.” Board of Educ. v. Neptune Twp. Educ. Ass’n, 144 N.J. 16, 25, 675 A.2d 611 (1996)(quotations omitted). “[T]he best approach to the meaning of a tax statute is to give to the words used by the Legislature their generally accepted meaning, unless another or different meaning is expressly indicated.” Public Serv. Elec. & Gas Co. v. Township of Woodbridge, 73 N.J. 474, 478, 375 A.2d 1165 (1977)(quotations omitted). “ ‘The duty of the Director, and this court, is to give meaning to the wording of'the statute and, where the words used are unambiguous, apply its plain meaning in the absence of a legislative intent to the contrary.’ ” Vassilidze v. *109 Director, Div. of Taxation, 24 N.J.Tax 278,291 (Tax 2008)(quoting Sutkowski v. Director, Div. of Taxation, 312 N.J.Super. 465, 475, 712 A.2d 229 (App.Div.1998)).
L. 2002, c. 40, § 3 contains unambiguous language. The statute provides that when determining a taxpayer’s “entire net income” for CBT purposes, which is based on federal taxable income:
Notwithstanding the provisions of subsection (k) of section 168 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.168 ... for property acquired after September 10, 2001 and before September 11, 2004, the depreciation deduction otherwise allowed pursuant to section 167 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.167, shall be determined pursuant to the requirements and limitations of section 168 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.168. . . . as if that subsection (k) [was] not in effect.
[L. 2002, c. 40, § 3.]
Standing alone, this unequivocal language is susceptible to only one meaning: that New Jersey decoupled completely from the federal bonus depreciation statute.
However, according to Section 33 of L. 2002, c. 40, the only provision of the Business Tax Reform Act, of which, L. 2002, c. 40, § 3 was a part, concerning the effective date of the statute: “[tjhis act shall take effect immediately and apply to privilege periods and taxable years beginning on or after January 1, 2002____”
A “privilege period” is defined by the Legislature as “the calendar or fiscal accounting period for which a tax is payable under this act.” N.J.S.A. 54:10A-4(j). A “fiscal year” means “an accounting period ending on any day other than the last day of December on the basis of which the taxpayer is required to report for federal income tax purposes.” N.J.S.A. 54:10A-4(i). As TMCC reports its income to the federal government based on a fiscal year which begins on October 1, the provision decoupling New Jersey from federal bonus depreciation applies to TMCC beginning with its fiscal year that commences October 1, 2002, which is the first TMCC fiscal year “beginning on or after January 1, 2002.” The parties are in agreement on this point.
They part ways with respect to the property that falls within the decoupling statute. Here too, the language of L. 2002, c. 40, § 3 is plain. The statute applies to “property acquired after September 10, 2001 and before September 11, 2004____” L. 2002, *110 c. 40, § 3. The Director’s regulation, which purports to limit the decoupling amendment to property acquired after January 1, 2002 and to property obtained during TMCC’s fiscal year commencing October 1, 2002, alters the scope of the decoupling statute in contravention of its express terms.
The Legislature expressly provided that the decoupling from federal bonus depreciation applied to property “acquired after September 10, 2001 and before September 11, 2004----” L. 2002, c. 40, § 3. The Director does not have the authority to alter that statutory language through promulgation of a regulation applying the decoupling to property acquired after January 1, 2002 and during a fiscal year commencing on or after January 1, 2002. Granted, L. 2002, c. 40, § 33 provides that § 3 applies to privilege periods and tax years commencing on or after January 1, 2002. The effective date for the privilege period for a particular taxpayer, however, is not coterminous with the date on which property must be acquired to fall within decoupling from federal bonus depreciation. The statute plainly provides that New Jersey decouples from federal bonus depreciation for property acquired after September 10, 2001. For TMCC, the decoupling begins with its fiscal year starting October 1, 2002. The property that is the subject of the decoupling, however, is property acquired after September 10, 2001, even if acquired prior to the October 1, 2002 start of TMCC’s fiscal year. There is nothing in the statute supporting the Director’s limitation of the decoupling to property acquired after January 1, 2002 and to property acquired during a fiscal year commencing on or after January 1,2002.
The Director argues that his regulation has been in place since 2003 without legislative alternation, suggesting acquiescence in the Director’s interpretation of the statute. See Amerada Hess Corp. v. Director, Div. of Taxation, 107 N.J. 307, 322, 526 A.2d 1029 (1987)(“Legislative inaction has been called a ‘weak reed upon which to lean’ and a ‘poor beacon to follow’ in construing a statute.”)(quoting 2A C. Sand, Sutherland Statutory Construction, § 49.10 (4th ed.1984)), aff'd, 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989). The Legislature, however, did take action with respect to federal bonus depreciation decoupling after promul *111 gation of the Director’s regulation. The subsequent legislative action supports the conclusion that the Director’s regulation is contrary to legislative intent.
N.J.S.A. 54:10A-4(k) was amended again in 2004. L. 2004, c. 65, § 24 amended the relevant portions of the statute as follows:
(12)(A) Notwithstanding the provisions of subsection (k) of section 168 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.168 ... for property acquired after September 10, 2001 and boforo Soptombor-1-V20Q4, the depreciation deduction otherwise allowed pursuant to section 167 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.167, shall be determined pursuant to tho roquiromonts and limitations of section 168 of the federal Internal Revenue Code of 1986, 26 U.S.C. s.168____as if that subsection (k)-[wa&]-not-in-effeot the provisions of the federal Internal Revenue Code of 1986 (26 U.S.C. s.1, et seq.) in effect on December 31,2001,
This amendment to N.J.S.A. 54:10A-4(k) took effect on June 30, 2004. L. 2004, c. 65, § 27.
The 2004 amendment removed the September 11, 2004 end date, likely because Congress had extended federal bonus depreciation to property placed into service through January 1, 2005. P.L. 108-27 § 201. Yet, the amendment retained the September 10, 2001 starting date. This effectively confirms that the Legislature intended the decoupling to apply to property put into service after September 10, 2001. The Legislature did not provide that the decoupling applies only to property acquired after January 1, 2002 and during a fiscal year beginning on or after January 1, 2002.
The Director also defends the date limitations in N.J.A.C. 18:7-5.2(a)(2)(iv) as necessary to further administrative convenience. It is not at all clear to the court how it is more convenient to calculate an entity’s entire net income without the federal bonus depreciation for property acquired after January 1, 2002 than it would be to make the same calculation for property acquired after September 10, 2001. The calculations would be different, but one would be no more difficult or administratively convenient than the other. It is also doubtful that the Director’s administrative convenience is a sufficient ground for alteration of a defining date in a tax statute. If the Legislature established a critical date in a tax statute that is cumbersome for the Director to administer, the Legislature’s choice must be respected.
*112 To the extent that N.J.A.C. 18:7-5.2(a)(2)(iv) purports to limit New Jersey’s decoupling from federal bonus depreciation to property acquired after January 1, 2002 and in a fiscal year beginning on or after January 1, 2002, the regulation is an unreasonable exercise of the Director’s authority As a result, the limitation on the State’s decoupling from federal bonus depreciation to property acquired after January 1, 2002 and during a fiscal year that commenced on or after January 1, 2002 is invalid. The regulation will apply to all property acquired by TMCC after September 10, 2001 and will begin for TMCC with its fiscal year commencing October 1, 2002.
B. Whether TMCC May Adjust the Federal Basis in its Property to Account For Depreciation Deductions For Which it Received No New Jersey Benefit.
The CBT Act imposes a tax on each non-exempt domestic corporation and foreign corporation “for the privilege of having or exercising its corporate franchise in this State, or for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts with this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.” N.J.S.A. 54:10A-2. As noted above, the tax is imposed on a corporation’s “entire net income,” which is defined as follows:
“Entire net income” shall mean total net income from all sources, whether within or without the United States, and shall include the gain derived from the employment of capital or labor, or from both combined, as well as profit gained through a sale or conversion of capital assets.
[N.J.S.A. 54:10A-4(k)(emphasis added).]
This broad definition of entire net income is limited in the following paragraph of the statute:
For the purpose of this act, the amount of a taxpayer’s entire net income shall be deemed prima facie to be equal in amount to the taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report ... to the United States Treasury Department for the purpose of computing its federal income tax____
[N.J.S.A. 54:10A-4(k).]
This provision of the statute couples entire net income under the CBT Act to line 28 of the federal income tax return which is *113 entitled “Taxable income before net operating loss deduction and special deductions.”
After linking entire net income for CBT purposes to line 28 of the federal return, the statute provides that “[ejntire net income shall be determined without the exclusion, deduction of credit of’ and lists several exceptions — both additions and subtractions — to federal tax statutes that define federal taxable income. See N.J.S.A. 54:10A-4(k)(2)(A) through (J). The statute also contains various additional subsections refining the calculation of an entity’s entire net income for CBT purposes.
The fact that entire net income under the CBT Act is coupled to federal taxable income is well recognized by legal precedents. A corporation’s entire net income is presumptively the same as its federal taxable income before net operating loss deductions and special deductions. Amerada Hess, supra, 107 N.J. at 313, 526 A.2d 1029. The CBT Act uses federal taxable income as a starting point to determine a corporation’s entire net income “unless the Legislature specifically enacts legislation nullifying the federal provisions.” Nine Franklin Corp. v. Director, Div. of Taxation, 13 N.J.Tax 121, 133 (App.Div.1993)(aceepting the Director’s argument that entire net income is equal to federal taxable income). As the Appellate Division explained, “[t]he Internal Revenue Code is intended to be controlling in determining taxable income under N.J.S.A. 54:10A-4(k).” Corporate Property Investors v. Director, Div. of Taxation, 15 N.J.Tax 205, 208 (App.Div.1995)(citing International Flavors & Fragrances, Inc. v. Director, Div. of Taxation, 5 N.J.Tax 617, 624 (Tax 1983), aff'd, 7 N.J.Tax 652 (App.Div.1984), aff'd, 102 N.J. 210, 507 A.2d 700 (1986)); see also The Reuben D. Donnelley Corp. v. Director, Div. of Taxation, 128 N.J. 218, 224, 607 A.2d 1281 (1992)(“The CBT Act uses federal-taxable income as the starting point to determine a corporation’s entire net income.... ”).
The Attorney General of New Jersey acknowledged this interpretation of the CBT Act in a Formal Opinion issued in 1960. The Formal Opinion, which interpreted the then-existing regulation defining entire net income, provides:
*114 [t]he regulation does not appear to contemplate any departures from Federal taxable income other than those expressly prescribed in the statute. It is our opinion that, as suggested by the quoted regulation, the definition of “entire net income” is always equivalent to Federal “taxable income” and that the presumption, which the use of the term “prima facie” implies is subject to being rebutted, is a presumption as to the correctness of the amount of taxable income reported by the taxpayer or determined by the Internal Revenue Service rather than the concept of “taxable income.”
[Attorney General Formal Opinion 1960-2 (Feb. 10, 1960).]
Although courts “are not bound to adopt the Attorney General’s Formal Opinion as a correct statement of the law, it is nonetheless entitled to a degree of deference, in recognition of the Attorney General’s special role as the sole legal advisor to most agencies of State Government, including the Treasury Department and the Division of Taxation.” Quarto v. Adams, 395 N.J.Super. 502, 513, 929 A.2d 1111 (App.Div.2007)(citing Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 70, 389 A.2d 465 (1978) and Board of Educ. v. Board of Educ., 361 N.J.Super. 488, 494, 825 A.2d 1215 (App.Div.2003), certif. denied, 178 N.J. 454, 841 A.2d 92 (2004)).
None of the provisions of N.J.S.A. 54:10A-4(k) expressly states that a taxpayer is entitled to depart from its federal taxable income to account for depreciation deductions which benefitted the taxpayer for federal tax purposes but had no benefit for New Jersey tax purposes. This court has held that in the absence of an express statutory provision to the contrary, the legislative declaration in N.J.S.A. 54:10A-4(k) that “entire net income” for CBT Act purposes equates to federal taxable income controls. International Business Machines Corp. v. Director, Div. of Taxation, 26 N.J.Tax 102, 112 (Tax 2011)(“The court is not permitted to ignore the unequivocal provisions of N.J.S.A. 54:10A-4(k) linking entire net income to federal taxable income with limited, express exceptions, or the established legal precedents recognizing that the Legislature coupled entire net income under the CBT to federal taxable income.”) (citations omitted).
There are, however, provisions of the CBT Act, in particular N.J.S.A. 54:10A-4, that suggest that the Legislature intended to tax only an entity’s actual economic gains — the accessions to its wealth — from the sale of its property and not artificial gains resulting from unused depreciation deductions. As noted above, *115 N.J.S.A. 54:10A-4(k) defines “entire net income,” the starting point for determining an entity’s CBT liability, as including “profit gained through a sale or conversion of capital assets.” The Legislature’s reference to “profit” is meaningful. Use of that word is indicative of an intention to assess the tax based on accessions to an entity’s wealth resulting from the disposition of capital assets.
In addition, N.J.S.A. 54:10A-4(k)(3) provides that the Director
[m]ay, whenever necessary to properly reflect the entire net income of any taxpayer, determine the year or period in which any item of income or deduction shall be included, without being limited to the method of accounting employed by the taxpayer.
This provision acknowledges the concept that adjustments to an entity’s federal taxable income may be necessary to ensure that its entire net income is properly reflective of the entity’s actual gains during the period for which the tax is assessed.
Finally, N.J.A.C. 18:7-5.2(a)(2)(iv), the Director’s regulation interpreting the federal bonus depreciation decoupling provision, states that upon early retirement of an asset, “a basis adjustment will be required to equalize Federal and State basis.” This is an express declaration by the Director that adjustments to federal basis may be necessary to calculate accurately an entity’s gain from the disposition of property for CBT purposes.
Standing alone, these provisions might not be sufficient to depart from the holding in International Business Machines, supra, and the well-recognized concept that an entity’s entire net income for CBT purposes equates to its federal taxable income absent an express statutory provision authorizing a deduction or addition to the entity’s federal taxable income. There is surface appeal to the argument that the Legislature, having enacted a number of specific additions and deductions from federal taxable income in N.J.S.A. 54:10A-4(k), could easily have enacted a statute expressly requiring adjustments to federal basis to account for federal depreciation deductions which provided no New Jersey tax benefit. Significant appellate precedents interpreting the GIT Act, however, establish a broad principle that State tax policy prohibits the assessment of a tax on “phantom income” resulting *116 from depreciation deductions used by the taxpayer for federal purposes but which resulted in no New Jersey tax benefit. Absent these precedents the court would likely reject TMCC’s argument on this point. The court, however, can identify no principled reason why the rule announced in Koch v. Director, Div. of Taxation 157 N.J. 1, 722 A.2d 918 (1999), and applied in Moroney, supra, should not apply in the context of the CBT Act. This conclusion is particularly true in light of the above-cited provisions of the Act and the Director’s regulation suggesting that the Legislature intended to capture only an entity’s profits from the sale of capital assets when calculating entire net income under N.J.S.A. 54:10A-4(k).
The underpinnings of TMCC’s argument on this point are found in the Supreme Court’s holding in Koch. At issue in that case was the method to be used to calculate a partner’s gain from the disposition of his partnership interest for GIT purposes. The taxpayer had purchased his partnership interest for $75,000 cash. He also agreed to be personally liable for a portion of the partnership’s indebtedness. 157 N.J. at 3-4, 722 A.2d 918. Over the course of four years, the taxpayer was allocated a portion of the partnership’s losses. He deducted those losses on his federal income tax return. Id. at 4, 722 A.2d 918. Accordingly, the basis of his partnership interest for federal tax purposes was reduced to zero. Ibid. New Jersey law did not allow the taxpayer to use the partnership losses to offset gains on his New Jersey income tax returns.
The taxpayer sold his partnership interest in 1988 for cash, the elimination of his capital account, and a release from the partnership’s creditors. Ibid. On his federal income tax return, the taxpayer reported gain calculated using a basis of zero. This was required by federal tax law because the taxpayer had previously used losses from the partnership to offset income in an amount exceeding his original investment of capital in the partnership. On his New Jersey income tax return, the taxpayer reported gain calculated using a basis of $75,000. He did not reduce his New Jersey basis because he had not been able to use any partnership *117 losses to offset income on his New Jersey income tax returns. Id. at 4-5, 722 A.2d 918.
The Director recalculated the taxpayer’s income from the sale of his partnership interest using a basis of zero. This determination was based on the Director’s contention that N.J.S.A. 54A:5-1c required the taxpayer’s gain to be calculated using “the adjusted basis used for federal income tax purposes,” which was zero. Id. at 5, 722 A.2d 918. The reduced basis increased the taxpayer’s gain taxable by New Jersey.
Although this court and the Appellate Division agreed with the Director, the Supreme Court reversed. The court held that three provisions of N.J.S.A. 54A:5-1(c) had to be harmonized. Those provisions of the statute require: (1) the taxpayer’s use of the method of accounting allowed for federal income tax purposes; (2) the taxpayer’s use of the federal adjusted basis; and (3) the exclusion of gains to the extent that federal rules require nonreeognition. The Court concluded that where a taxpayer “has gained no tax benefit under the Act” through use of losses in prior years he can be taxed only on “his actual economic gain and not on fictitious income” when property is sold. Id. at 14, 722 A.2d 918. “Any income tax imposed on an amount greater than [the taxpayer’s] economic gain ... constitutes a tax on amounts that represent neither economic gain nor recovery of a past tax benefit. Instead, it represents a tax on a return of capital. Such a result was not intended by the Legislature.” Id. at 9, 722 A.2d 918. Thus, the Court concluded that where the taxpayer’s federal adjusted basis in a partnership interest reflects benefits obtained by the taxpayer under federal law, but not available under New Jersey law, the Director cannot use the federal adjusted basis to calculate gain from the sale of that partnership interest.
The Appellate Division applied the holding in Koch when deciding a challenge to GIT assessments in Moroney. In that ease, two couples sold rental properties. In calculating the gain they realized from the sale of their property the Moroneys used the purchase price as the basis. 376 N.J.Super. at 4, 868 A.2d 1132. They did this because in each year that they owned the property *118 operating expenses exceeded rental income, which resulted in no tax benefit to them under New Jersey law. Thus, although the federal basis of the property was reduced by depreciation, the Moroneys did not use the federal basis when calculating their gain. The Director adjusted the basis of the Moroneys’ property by allowed and allowable federal depreciation on the property for the period of their ownership. This had the effect of raising the Moroneys’ taxable gain. Ibid.
The other couple, the Denitzios, calculated the gain on the sale of their rental property using the adjusted basis for federal tax purposes. The federal adjusted basis was determined by reducing the cost of the property by the cumulative amount of depreciation deductions allowed or allowable in the years in which they owned the property. Ibid. They subsequently amended their returns. In the amended returns, the Denitzios added back to the basis of their property an amount equal to the depreciation expense that they claimed had not been utilized in determining net income from the property. This decreased their gain, resulting in a refund request. Ibid. The Director agreed that the federal adjusted basis of the property should be adjusted by adding the cumulative amount of depreciation expense that was not utilized by the taxpayers. Ibid. The Director disagreed with the taxpayers, however, with respect to how to determine the amount of depreciation deductions they did not use. Id. at 5, 868 A.2d 1132.
This Court reversed the Director’s determinations. The court recognized that the holding in Koch “required adjustments to the federal adjusted basis to reflect the amount of depreciation that was not used by the taxpayers for New Jersey gross income tax purposes.” Ibid. The court found, however, that the Director’s approach to making the adjustments was “inconsistent with the ‘essence’ of the Koch decision.” Ibid. The court concluded that “the amount of unutilized depreciation is the cumulative amount of allowed or allowable depreciation that offsets income remaining after deduction of operating expenses in each tax year.” Ibid.
The Appellate Division affirmed. The court noted that
*119 [b]ecause N.J.S.A. 54A:5-1(c) imposes a tax on net gain from the sale or disposition of property, this section of the Act reflects an intent on the part of the Legislature to “tax only those transactions from which an individual derives an economic gain.”
“The net gains concept is an expression of the difference between the cost of the property and the amount realized from the sale, which is the accession to wealth.”
[Id. at 6-7, 868 A.2d 1132 (quoting Walsh v. Director, Div. of Taxation, 10 N.J.Tax 447, 460 (Tax 1989), aff'd o.b., 240 N.J.Super. 42, 572 A.2d 222 (App.Div.1990)) (citation omitted).]
The court observed that “a tax on the return of capital ... was not intended by the Legislature.” Id. at 7, 868 A.2d 1132. As the court explained,
We are convinced, however, that the use of the federal adjusted basis here would be inconsistent with Koch. In each of the years that the Moroneys owned the rental property, their expenses exceeded gross receipts. Therefore, they did not obtain any benefit for New Jersey tax purposes from the depreciation deductions. Similarly, the gross receipts from the Denitzios’ property exceeded expenses in only three years. Thus, the Denitzios realized a tax benefit from depreciation only in those three years. Reducing basis by the cumulative amount of allowed and available depreciation results in a corresponding increase in the net gain from the sale that does not reflect the recovery of a tax benefit actually realized or an economic gain. In these circumstances, use of the federal adjusted basis would result in the imposition of a tax upon a return of capital contrary to the intent of the [Gross Income Tax] Act as interpreted in Koch.
[Id. at 10-11, 868 A.2d 1132.]
The facts in Moroney and the present matter are strikingly similar. Both the Moroney taxpayers and TMCC purchased property from which they generated rental income. The taxpayers in both instances benefitted from federal depreciation deductions from which they derived no New Jersey tax benefit. They lost money on the rental transactions and were prohibited from carrying forward their losses. In addition, when the taxpayers in both instances disposed for their property the taxpayers were required by federal law to use a basis that was adjusted downward to account for the benefits accorded to the taxpayers by federal depreciation deductions. Without a basis adjustment for New Jersey tax purposes the taxpayers in both circumstances would be taxed by New Jersey on fictitious gains attributable to the federal depreciation deductions which had no New Jersey tax benefit. The Director has offered no convincing argument that TMCC should be treated differently than the taxpayers in Moroney *120 merely because TMCC is subject to CBT and the Moroney taxpayers were subject to GIT.
The court is cognizant of the fact that the GIT Act and the CBT Act “are not in pari materia, are not interchangeable, and provisions from one Act cannot be engrafted into the other.” Marrinan v. Director, Div. of Taxation, 17 N.J.Tax 47, 56 (Tax 1997). “The CBT Act and the GIT Act are separate and distinct. They are not in pari materia. In order to be in pari materia, statutes must have “the same purpose or object.” Mandelbaum v. Director, Div. of Taxation, 20 N.J.Tax 141, 151 (Tax 2002)(citing Richard’s Auto City, Inc. v. Director, Div. of Taxation, 140 N.J. 523, 540, 659 A.2d 1360 (1995)). As Judge Kuskin explained,
The object of the CBT Act is to impose a tax on a domestic or foreign corporation “for the privilege of having or exercising its corporation franchise in this State.” N.J.S.A. 54:10A-2. This tax is not imposed on individuals. By contrast, the purpose of the GIT Act is to impose tax on individuals, estates and trusts. Cooperstein v. Director, Div. of Taxation, 13 N.J.Tax 68, 93 (Tax 1993), aff'd, 14 N.J.Tax 192 (App.Div.1994)[certif. denied, 140 N.J. 329, 658 A.2d 728 (1995) ]. [Mandelbaum, supra, 20 N.J.Tax at 151.]
In addition, the CBT Act, unlike the GIT Act, ties taxable income in New Jersey to the taxpayer’s federal taxable income. The GIT Act has long been recognized as not mirroring federal taxing statutes. As the Supreme Court’s explained in Smith v. Director, Div. of Taxation, 108 N.J. 19, 32, 527 A.2d 843 (1987):
[e]ven a cursory comparison of the New Jersey Gross Income tax and the Internal Revenue Code indicate that they are fundamentally disparate statutes.
Calculation of CBT liability, on the other hand, begins with the proposition that the taxpayer’s “entire net income shall be deemed prima facie to be equal in amount to the taxable income” it is required to report to the federal government. N.J.S.A. 54:10A-4(k).
TMCC, however, does not ask this court to graft a provision of the GIT Act onto the CBT Act. It asks the court to interpret existing provisions of the CBT Act to subject to CBT only the actual gains realized by an entity through the sale of its capital assets. In fact, there are parallels between the GIT Act provisions interpreted in Moroney and the CBT Act’s provisions defining an entity’s entire net income that support TMCC’s position. *121 At issue in Moroney was N.J.S.A. 54A:5-1(c), which defined a category of income subject to GIT. The statute provides that the following shall be included in a taxpayer’s taxable income for GIT purposes:
Net gains or net income, less net losses, derived from the sale, exchange or other disposition of property ... as determined in accordance with the method of accounting allowed for federal income tax purposes. For the purpose of determining gain or loss, the basis of property shall be the adjusted basis used for federal income tax puiposes, except as expressly provided for under this act____
* * 1;
The term “net gains or net income” shall not include gains or income from transactions to the extent to which nonrecognition is allowed for federal income tax puiposes.
[N.J.S.A. 54A:5-1(c).]
N.J.S.A. 54:10A-4(k) also imposes a tax on “net income,” including “profit gained through a sale ... of capital assets.” In addition, N.J.S.A. 54:10A-4(k), like N.J.S.A. 54A:5-1(c), ties the calculation of net gains to federal tax concepts by deeming entire net income to be “prima facie” the same as federal taxable income. Yet, a departure from federal basis was permitted in Moroney because the GIT Act “expresses an intent to tax only those transactions from which a [taxpayer] derives an economic gain.” Koch, supra, 157 N.J. at 9, 722 A.2d 918 (quoting Walsh, supra, 10 N.J.Tax at 460). The CBT Act also expresses the intent to tax only the gain a taxpayer realizes from the sale of property. Permitting TMCC to employ a Moroney adjustment to the basis of its property would further this statutory objective.
Nor is the court convinced by the Director’s argument that application of the holding in Moroney to calculate TMCC’s taxable income would contravene the CBT Act’s prohibition on the carry forward of net operating losses during the relevant tax years. Prior to 2002, the CBT Act permitted an entity to carry forward its net operating losses “to each of the seven privilege periods following the period of the loss____” N.J.S.A. 54:10A-4(k)(6)(B). In 2002, the Legislature amended the CBT Act to suspend net operating loss carry forward deductions for the 2002 and 2003 privilege periods. L. 2002, c. 40. For any net operating loss that expired during the 2002 and 2003 privilege periods, however, the carry forward period was extended for an additional two years *122 after the 2003 privilege period. Ibid. The Director argues that adjusting the basis in TMCC’s vehicles to account for unused depreciation deductions would circumvent the Legislature’s decision to suspend net operating loss carry forwards for the relevant periods.
The Director made the same argument in Moroney, given that the GIT Act also prohibits loss carry forwards. See N.J.S.A. 54A:5-2 (“Losses which occur within one category of gross income may be applied against other sources of gross income within the same category of gross income during the taxable i/ear.”)(emphasis added); Estate of Guzzardi v. Director, Div. of Taxation, 15 N.J.Tax 395 (Tax 1995), aff'd, 16 N.J.Tax 374 (App.Div.1996). The court rejected that position:
The Director characterizes plaintiffs arguments as an attempt to carry forward their allowable depreciation deductions by using them as an addition to basis or a deduction from gain in the year of sale. He asserts that such carryforward is in violation of N.J.S.A. 54A:5-2 as interpreted in Guzzardi. There, the Tax Court held that, under N.J.S.A. 54A:5-2, losses occurring in one year may not be carried forward to a later year, even where the Internal Revenue Code would permit such a carryforward.
I conclude that the Director’s arguments represent an effort to interpret or distinguish Kock in a manner that ignores the essence of the decision. Contrary to the mandate of Kocli, the Director fails to focus on plaintiffs’ actual economic benefits (accession to wealth and recovery of past tax benefits) and thereby achieves ... inappropriate results____
[Moroney v. Director, Div. of Taxation, 21 N.J.Tax 220, 228 (Tax 2004) (citations omitted).]
The Appellate Division in Moroney also noted the existences of the statutory bar to loss carry forwards under the GIT Act. 376 N.J.Super. at 14, 868 A.2d 1132 (“Third, and most important, the Act expressly bars any carry forward of losses into another tax year.”). The court did not view the statutory ban on carrying forward net operating losses to preclude an adjustment to federal basis.
In addition, it is notable that a Moroney adjustment and a loss carry forward are not the same. A Moroney adjustment increases the tax basis in depreciable property if the depreciation did not produce a New Jersey tax benefit in a prior year. By contrast, a net operating loss carry forward is much broader, allowing a prior year’s loss to offset gains in a subsequent year of any type of *123 income, regardless of whether the income in the subsequent year is connected to the property that produced the earlier deduction. Allowing a Moroney adjustment to basis does not equate to permitting a net operating loss carry forward, even if the resulting reduction in taxable income may be the same in some circumstances.
C. The Throw-Out Rule.
Pursuant to N.J.S.A. 54:10A-6, a foreign entity, such as TMCC, that maintains a regular place of business outside of the State “is obligated to pay tax only on that portion of its entire net income which is allocable to this State.” Stryker Corp. v. Director, Div. of Taxation, 18 N.J.Tax 270, 272-73 (Tax 1999), aff'd, 333 N.J.Super. 413, 755 A.2d 1200 (App.Div.2000), aff'd, 168 N.J. 138, 773 A.2d 674 (2001); see also Telebright Corp., Inc. v. Director, Div. of Taxation, 25 N.J.Tax 333 (Tax 2010), aff'd, 424 N.J.Super. 384, 38 A.3d 604 (App.Div.2012). The amount of an entity’s income subject to the CBT is determined by multiplying the entity’s entire net income by an allocation factor. N.J.S.A. 54:10A-4(b). The purpose of the allocation factor is to limit application of the CBT to only that income that has a sufficient nexus to New Jersey to satisfy constitutional constraints on State taxation. Central National-Gottesman, Inc. v. Director, Div. of Taxation, 14 N.J.Tax 545, 552 (Tax 1995), aff'd, 291 N.J.Super. 277, 677 A.2d 265 (App.Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996). Use of formula apportionment to derive taxable income has long been established. See Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 165, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, 553 (1983).
During the tax years relevant to this appeal, the allocation factor was equal to the average of four fractions: a property fraction, a payroll fraction, and a receipts fraction (which is considered twice). The fractions had as their numerators, respectively, the property, payroll and sales receipts of the taxpayer fairly attributable to New Jersey, and as their denominators the total property, payroll and sales receipts of the taxpayer worldwide. Stryker, supra, 18 N.J.Tax at 276-77. According to *124 N.J.S.A. 54:10A-6, as it read at the time applicable to this matter, a foreign corporation’s taxable net worth and taxable net income is “determined by multiplying such entire net worth and entire net income, respectively, by an allocation factor which is the property fraction, plus twice the sales fraction plus the payroll fraction and the denominator of which is four[.]” The property fraction is determined by dividing the average value of the taxpayer’s property in New Jersey by the average value of the taxpayer’s property everywhere. N.J.S.A. 54:10A-6(A). The payroll fraction is determined by dividing the taxpayer’s New Jersey payroll by total payroll. N.J.S.A. 54:10A-6(C).[3]
Without the Throw-Out Rule, the sales fraction is calculated as follows: receipts from sales, services, rents, royalties, and other business receipts in New Jersey are “divided by the total amount of the taxpayer’s receipts, similarly computed, arising during such period from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State.” N.J.S.A. 54:10A-6(B).
The Business Tax Reform Act of 2002 amended the receipts fraction of the CBT by including the Throw-Out Rule. The following was added to the final paragraph of N.J.S.A. 54:10A-6(B):
provided however, that if receipts would be assigned to a state, a possession or territory of the United States or the District of Columbia or to any foreign country in which the taxpayer is not subject to a tax on or measured by profits or income, or business presence or business activity, then the receipts shall be excluded from the denominator of the sales fraction.
[L. 2002, c. 40, § 8.] [4]
As the Supreme Court explained in Whirlpool Properties, Inc. v. Director, Div. of Taxation, 208 N.J. 141, 155, 26 A.3d 446 (2011):
*125 With the enactment of the Throw-Out Rule, the sales fraction was transformed; formerly a ratio of New Jersey receipts to total receipts, it became a ratio of New Jersey receipts to taxed receipts. When a receipt is thrown-out, the sales fraction always increases, causing the apportionment formula and the resultant CBT liability to increase.
In Whirlpool, the taxpayer had no physical presence in New Jersey and conducted all of its business activities outside of the State. The company owned and managed brand names that it licensed to its parent, a New Jersey taxpayer, as well as other affiliates and third parties. The taxpayer earned income based on the number of goods bearing its brand that were produced by licensee plants, none of which were located in New Jersey. Ibid. The taxpayer did not file CBT returns in New Jersey for tax years 1996 through 2003 because it did not have a physical presence in this State. The Director issued an assessment against the taxpayer after calculating its allocable income based on information gleaned from the taxpayer’s related entities. Id. at 156, 26 A.3d 446. Using the Throw-Out Rule, the Director allocated to New Jersey 29.2572 percent of the taxpayer’s 2002 income and 41.8647 percent of the taxpayer’s 2003 income. By comparison, before the Throw-Out Rule came into effect, the portion of the taxpayer’s income allocated to New Jersey ranged between .9546 percent and 1.3337 percent from the period 1996 through 2001. Ibid. The taxpayer challenged its assessment in this court and its facial challenge to the constitutionality of the Throw-Out Rule ultimately arrived at the Supreme Court.
In its analysis of the facial constitutionality of the Rule, the Court explained that
The receipts that may be thrown out fall into two types: (1) receipts that are not taxed because the taxpayer does not have the requisite constitutional contacts with a state or because of congressional action setting some other, lower threshold of what Congress considers a business’s activity in a state sufficient for a state to tax the business, such as P.L. 86-272; and (2) receipts that are not taxed because a state chooses not to impose an income tax. The distinction is simple; in the first category the other state lacks jurisdiction to tax, and in the second the state chooses not to exercise its jurisdiction.
[Id. at 168-69,26 A.3d 446 (footnote omitted).]
When examining the external consistency prong of the Commerce Clause analysis, see Container Corp., supra, 463 U.S. at 169, 103 S.Ct. at 2942, 77 L.Ed.2d at 556, the Court held that
*126 [t]he Throw-Out Rule’s external consistency depends on the rationale for throwing out the receipts. Throwing out receipts because another state does not have an income tax will not result in an externally consistent outcome because a state’s decision to have an income tax is independent of a taxpayer’s business activity.
* * *
On the other hand, the Throw-Out Rule is arguably externally consistent when the untaxed receipts are thrown out due to a state’s lack of jurisdiction to tax. The Throw-Out Rule still operates to increase New Jersey’s share, but in this situation New Jersey also may have contributed more to the production of a sale than the sales factor, without the Throw-Out Rule, would suggest.
[Whirlpool, supra, 208 N.J. at 169, 170, 26 A.3d 446.]
The Court recognized, however, that the Throw-Out Rule as it was drafted by the Legislature does not distinguish between these categories of receipts. To solve this dilemma, the Court turned to a long-recognized principle: “when ‘a statute may be open to a construction which would render it unconstitutional or permit its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation.’ ” Id. at 172, 26 A.3d 446 (quoting State v. Profaci, 56 N.J. 346, 350, 266 A.2d 579 (1970) (citation omitted)). The Court continued, “[sjimilarly, when a statute’s constitutionality is drawn into question or placed in serious doubt, this Court should ascertain whether a construction of the statute is possible that avoids the constitutional problem.” Id. at 172, 26 A.3d 446 (citing State v. Miller, 170 N.J. 417, 433 (2002)). To save the statute the court interpreted the Throw-Out Rule as follows:
The Throw-Out Rule operates constitutionally when the category of receipts that may be thrown out is limited to receipts that are not taxed by another state because the taxpayer does not have the requisite constitutional contacts with the state or because of congressional action such as P.L. 86-272. Although the ThrowOut Rule clearly operates in a constitutional manner in that situation, it does not in the situation of receipts that are not taxed by another state because the state chooses not to impose an income tax. Faced with a tax formula that predictably operates unconstitutionally in some circumstances, we will interpret the statute narrowly so that it generally operates constitutionally.
[Id. at 172-73, 26 A.3d 446.] [5]
*127 The Court’s holding was unequivocal: “We hold that facial constitutionality is satisfied because we interpret the statute to be limited in operation to the setting described favorably above: to receipts that are not taxed because the other state lacks jurisdiction to tax.” Id. at 173, 26 A.3d 446.
In light of the clear holding in Whirlpool, it is plain that the Director erred when, in calculating TMCC’s CBT liability, he removed from the denominator of the receipts fraction TMCC’s receipts from Nevada, South Dakota and Wyoming. It is undisputed that TMCC had between $25 million and $56 million in receipts in Nevada in each year’ from fiscal year 2003 to fiscal year 2006. TMCC also had significant receipts in South Dakota and Wyoming and had a significant physical presence in all three jurisdictions — through either property, payroll or both — during each relevant tax year. Those contacts are sufficient to vest in the three States the ability to impose tax. See Lanco, Inc. v. Director, Div. of Taxation, 188 N.J. 380, 908 A.2d 176 (2006)(ex-plaining the constitutional limits on State taxation of income generated by corporate activities), cert. denied, 551 U.S. 1131, 127 S.Ct. 2974, 168 L.Ed.2d 702 (2007).
TMCC paid tax to Nevada on its lease receipts under Nevada law. The parties dispute whether this tax was on TMCC’s business activity. The Director contends that the Nevada tax on TMCC was, in fact, a sales tax. The court need not resolve that issue, as it is clear that TMCC’s business activities in Nevada were sufficient for that State to impose a corporate income or corporate business activities tax on TMCC during the relevant tax years. A sufficient constitutional nexus is all that is required to preclude the removal of TMCC’s Nevada receipts from the denominator of the receipts fraction under the unequivocal holding in Whirlpool.
Similarly, TMCC had a sufficient presence in South Dakota and Wyoming, either through property or payroll, to subject TMCC to *128 the taxing authority of those States. The elected officials in South Dakota and Wyoming decided not to tax corporate income or corporate activities during the relevant tax years. This policy decision is not a constitutionally permissible basis on which to exclude receipts from those States from the denominator of TMCC’s receipts fraction for New Jersey CBT purposes. That proposition is made clear in Whirlpool. TMCC is, therefore, entitled to summary judgment in its favor on its Throw-Out Rule claims.
The court will enter an Order directing the Director to recalculate TMCC’s CBT obligations for fiscal years 2003 through 2006 in light of this opinion. If the re-computation of TMCC’s CBT obligations does not result in the resolution of this matter, the court will decide the remaining issues addressed in the parties’ cross-motions for summary judgment.

 At the parties’ suggestion, the court defers a determination on three issues raised in the cross-motions: (1) whether plaintiff's "cost of goods sold” should be deducted when calculating its Alternative Minimum Assessment under the CBT Act; (2) whether underpayment penalties assessed against plaintiff must be *100 abated; and (3) whether an amnesty penalty assessed against plaintiff violated due process and must be abated. It is possible that the court's decision on bonus depreciation, basis adjustment, and the Throw-Out Rule will lead to the resolution of the remaining issues.

 The Director also removed TMCC's foreign nation receipts from the denominator of TMCC’s receipts fraction. While TMCC challenges this aspect of the Director’s apportionment of TMCC's receipts to New Jersey, it presents limited arguments in its briefs with respect to its foreign nation income. In particular, the moving papers are silent with respect to the extent of TMCC’s contacts with the foreign nations in which it generated receipts. The court will refrain from reaching a decision with respect to TMCC’s receipts from foreign nations to give the parties an opportunity to brief the issue more fully, if necessary.

 The CBT apportionment formula changed as the result of legislative action in 2011. The formula will become single sales fraction formula following a three-year phase-in starting in January 2012. L. 2011, c. 59, § 1.

 The Throw-Out Rule was repealed by legislative action in 2008. L. 2008, c. 120, § 2. This statutory change has no effect on TMCC's CBT obligations for tax years at issue.

 P.L. 86-272, codified at 15 U.S.C. §§ 381-84, represents an exercise of Congressional authority to regulate state taxation of interstate commercial transactions. The statute prohibits a state from imposing net income taxes on *127 businesses whose only activity in the state is selling or soliciting orders for tangible property shipped from out of state to the taxing state.