NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

```
----------------------------------------------------x
JOSEPH C. & GERALDINE A.          :    TAX COURT OF NEW JERSEY
MUSUMECI,                         :
                                  :    DOCKET NO:  000169-2021
          Plaintiffs,             :
                                  :
          v.                      :
                                  :
DIRECTOR, DIVISION OF TAXATION,   :
                                  :
          Defendant.              :
----------------------------------------------------x
```

Decided:  March 28, 2023.

Joseph C. and Geraldine A. Musumeci, plaintiffs pro se.

Ramanjit Chawla, Deputy Attorney General, for defendant (Matthew J. Platkin, Attorney General of New Jersey, attorney).

CIMINO, J.T.C.

A bankrupt limited liability company (LLC) allocated a $2.3 million gain on paper to the taxpayer, an individual member of the LLC, to zero out a negative capital account.  The Director assessed the reported income as taxable.  Since the $2.3 million does not represent economic gain nor recovery of a past tax benefit, the assessment of the Director is reversed.

The court finds the following facts based upon the trial of this matter.  Joseph Musumeci invested $1.1 million in H2M Beverage LLC (H2M), a limited liability

company.[1] [2] H2M held a patent for an energy drink bottle in which the powdered supplement to the liquid could be mixed immediately before consumption. Over time, the venture attracted professional investors which Mr. Musumeci referred to as "angel investors." H2M was not a success and annual losses reduced Mr. Musumeci's capital account from $1.1 million to a negative balance of $7.7 million.

In 2015, H2M declared bankruptcy. By this point, the angel investors had effective control of the company. Due to disagreements with the angel investors, Mr. Musumeci was placed on severance. He was not involved in the day-to-day operations at the time of the bankruptcy filing, nor the issuance of the final tax paperwork of H2M. With the liquidation of H2M, the accountants hired to prepare the final returns zeroed-out the capital accounts of each of the members.

The aggregate value of the capital accounts of all members upon liquidation was negative $21.1 million. H2M's final returns reported $15.7 million of cancellation of indebtedness income taxable under federal law, as well as $6.7 million of nontaxable cancelled debt. See I.R.C. §§ 61(a)(11), 108 (under federal

---

[1]  Joseph and Geraldine Musumeci filed a joint tax return. However, the opinion only refers Mr. Musumeci since he was the investor in H2M.
[2]  In 2007, the Musumeci Irrevocable Trust in which Joseph Musumeci and Charles Musumeci were co-equal beneficiaries, invested $2.2 million in a predecessor entity, Liquid Lightening, LLC. In 2010, additional investors were attracted and H2M was formed. The $2.2 million initial investment in Liquid Lightening was then reallocated with Joseph Musumeci having a $1.1 million initial investment in H2M.

law, discharge of indebtedness is generally taxable).[3] The allocation of the cancelled debt income by H2M resulted in some members having a positive capital account and others having a negative capital account.

H2M also reported a $1.0 million loss for 2015. To zero-out the individual member capital accounts, the loss for 2015 was allocated to some members as a loss and to other members as a gain, all the while maintaining the aggregate total loss of $1.0 million.[4] The member agreement indicates no member has to make a personal contribution to zero-out a negative capital account. H2M allocated $2.3 million of income from the 2015 loss to zero-out Mr. Musumeci's capital account. Mr. Musumeci credibly established he did not realize any actual cash or assets upon dissolution of H2M, nor did he contribute any cash to zero-out his capital account. While Box 1 of the final Schedule K-1 information return issued by H2M indicates

---

[3] Formally I.R.C. § 61(a)(12) (amended by Pub. L. No. 115-97, § 11051(b)(1)(A), 131 Stat. 2054, 2089).

[4] In zeroing-out the capital accounts, there were also some other adjustments that netted to $200 thousand company-wide ($15.7 million taxable cancellation of debt + $6.7 million non-taxable cancellation of debt – $1.0 million loss – $200 thousand other adjustments – $100 thousand rounding error = $21.1 million capital accounts; the exact figures are $15,654,368 taxable cancellation of debt + $6,677,362 non-taxable cancellation of debt – $1,028,948 loss – $189,570 other adjustments = $21,113,212 capital accounts).

-3-

income of $2.3 million, Box 19 of the return confirms no funds or assets were distributed to him.[5] [6]  The Director assessed the reported $2.3 million as income.

The issue in this case is whether a member of an LLC is subject to taxation on allocated income used to zero-out a capital account when the member does not realize any economic gain or derive a tax benefit.  The complexity of this case arises in part from the hybrid nature of a limited liability company.  The members of an LLC have personal liability protection similar to shareholders of a corporation yet have the tax advantages of a partnership.  N.J.S.A. 42:2C-30 (liability protection); N.J.S.A. 42:2C-92 (for tax purposes, LLC treated as partnership); I.R.C. § 7701(a)(2); Treas. Reg. § 301.7701-3 (tax classification).   An LLC, like a partnership, is a flow-through entity for tax purposes.  Income and losses are passed through to the members of an LLC, as if they are partners in a partnership.  N.J.S.A. 54A:5-4; I.R.C. § 701 (pass through provisions for partnerships).

Many of the partnership accounting principles are applicable to LLCs.  In partnership accounting, each partner has a capital account.  N.J.S.A. 42:1A-21(a).

---

[5] The allocations and distributions to members are reported on Schedule K-1s issued by the LLC.  See I.R.C. § 6031(b).  Treas. Reg. § 1.6031(b)-1T.
[6]  Box 11 of the K-1 indicates Mr. Musumeci was allocated $3.7 million of the federally taxable cancellation of debt income.  Cancellation of debt income is not taxable under the Gross Income Tax Act. Weintraub v. Dir., Div. of Tax'n, 19 N.J. Tax 65, 76 (Tax 2000).

These capital accounts track the equity allocated to each partner.[7] N.J.S.A. 42:1A-21(b). Some of the default rules have been codified by the Uniform Partnership Act, while the Internal Revenue Code and Regulations set forth other requirements to be satisfied to avoid unfavorable tax treatment. See N.J.S.A. 42:1A-21, -45 (New Jersey's adoption of Uniform Partnership Act dealing with partner allocations); I.R.C. § 704 and Treas. Reg. § 1.704-1(b)(2)(iv) (federal provisions as to partner allocations).

The basics are each partner's capital account is increased by a partner's contributions and share of income, and decreased by a partner's distributions and share of losses. N.J.S.A. 42:1A-21(a). At the conclusion or dissolution of the partnership, if a partner's capital account is positive, the partner receives a distribution which would reduce the capital account to zero. N.J.S.A. 42:1A-45. On the other hand, if a partner's capital account is negative, the partner must pay into the partnership to increase the account to zero. Ibid. These rules can be modified by agreement. N.J.S.A. 42:1A-4.

H2M's operating agreement provides a waiver of the deficit restoration obligation for negative capital accounts. A waiver for a traditional partnership can be problematic since each partner is personally liable for debts and obligations of

---

[7] The concept is similar to basis which tracks the value assigned to an investment for tax purposes but is calculated differently. See I.R.C. § 705.

the partnership.  N.J.S.A. 42:1A-18.  But see N.J.S.A. 42:2A-27 (in a limited partnership, only general partners liable).  For an LLC such as H2M, the members are not personally liable for the debts of the LLC.[8]  N.J.S.A. 42:2C-30.

Adding to the complexity are the rules governing the taxation of partnerships. The federal income taxation regulations span twelve thousand pages.  26 C.F.R. part 1.  The partnership allocation provisions of the regulations "have been called a creation of prodigious complexity essentially impenetrable to all but those with the time, talent, and determination to become thoroughly prepared experts on the subject."  Lawrence Lokken, Partnership Allocations, 41 Tax L. Rev. 545, 621 (1986).

The New Jersey Legislature in enacting the Gross Income Tax Act (Act), N.J.S.A. 54A:1-1 to 10-12, sought a radical departure from the complexity and perceived unfairness of the federal taxing system.  "Our Legislature . . . set a different course for New Jersey when it enacted the state income tax in 1976."  Waksal v. Dir., Div. of Tax'n, 215 N.J. 224, 233 (2013).  "A statement by the Senate Revenue, Finance, and Appropriations Committee explains that the [Gross Income Tax Act] 'was intended as a tax on income, shorn of the deductions and items of tax preference in the Federal Income Tax.'"  Smith v. Dir., Div. of Taxation, 108 N.J. 19, 30 (1987) (citing S. Rev., Fin. & Appropriations Comm. Statement to A. Comm. Substitute for

---

[8]  The members can have obligations to each other.  N.J.S.A. 42:2C-33.

A. 1513 2 (May 3, 1976)).  The Act is not modeled on the Internal Revenue Code and is instead a tax based on a simpler system.  Shechtel v. Dir., Div. of Tax'n, 32 N.J. Tax 180, 200 (App. Div. 2020).

To these ends, "fictitious income" or "phantom income" is not to be taxed. Koch v. Dir., Div. of Tax'n, 157 N.J. 1, 14 (1999), Moroney v. Dir., Div. of Tax'n, 376 N.J. Super 1, 12-13 (App. Div. 2005).  See Toyota Motor Credit Corp. v. Dir., Div. of Tax'n, 28 N.J. Tax 96, 115-16, 119 (Tax 2014), aff'd. o.b., 30 N.J. Tax 321 (App. Div. 2017) (applying concept from gross income tax to corporation business tax).   On the other hand, a taxpayer cannot rely upon "phantom losses."  Shechtel, 32 N.J. Tax at 197-98.  Our gross income tax is to be imposed upon economic benefit or gain which is sometimes referred to an accession to wealth.  Koch, 157 N.J. at 9. The enactment comports with the longstanding view in this State that taxation is a practical matter.  In re Lichtenstein's Estate, 52 N.J. 553, 569 (1968).

The seminal New Jersey Supreme Court decision of Koch is instructive.  In 1983, Koch purchased a limited partnership interest for $75,000.  Koch, 157 N.J. at 3.  He agreed to be personally liable for a portion of the debt of the partnership.  Id. at 3-4.  From 1983 through 1987, he was allocated partnership losses which he deducted from his federal tax returns.  Id. at 4.  The losses resulted in his capital account being reduced from $75,000 to a negative $143,161.  Ibid.  In 1988, Koch sold his interest for $125,000 and a release from creditors of personal liability for

partnership debt. Ibid. A constructive payment of $143,161 eliminated the capital account deficit. Ibid. On his 1988 federal income tax return, Koch reported an amount realized of $268,161, consisting of the $125,000 sale price and the reversal of his negative capital account of $143,161. Ibid.

On his New Jersey return, Koch was not able to use any of the losses against New Jersey income. Id. at 5. He reported $50,000 as the net gain which reflected the difference between the sale proceeds of $125,000 and his purchase price of $75,000. Id. at 4-5. The Director disagreed and wanted Koch to report $268,611, the same amount of gain for New Jersey gross income tax purposes as reported for federal income tax purposes. Id. at 5.

The Supreme Court concluded the Gross Income Tax Act expresses an intent to tax only those transactions in which an individual derives an economic gain or has derived a tax benefit. Id. at 9. "Any income tax imposed on an amount greater than Koch's economic gain of $50,000 constitutes a tax on amounts that represent neither economic gain nor recovery of a past tax benefit. Instead, it represents a tax on a return of capital. Such a result was not intended by the Legislature." Ibid.

Mr. Musumeci invested $1.1 million in H2M. Losses reduced his capital account from $1.1 million to a negative $7.7 million. He did not have any obligation to replenish the capital account. In 2015, the company was liquidated, and Mr.

Musumeci was allocated income of $2.3 million on paper to eliminate the deficit in his capital account. He received zero dollars in cash.

The slender factual reed upon which the Director's case stands is the reporting of $2.3 million on the Schedule K-1 as income. The Director wants to elevate the K-1 form over substance. Certainly, the Director does not accept the mere reporting of an amount on an information return is sacrosanct since that would mean a similar loss would be unassailable. While the mere denial of income is not enough in any case, Mr. Musumeci credibly testified and provided documentation supporting H2M's financial difficulties leading to bankruptcy. Mr. Musumeci further credibly testified and provided supporting documentation establishing the income allocated to zero-out the capital account did not represent economic gain. While income is allocated in Box 1 of the K-1, no distribution of cash or assets is indicated in Box 19. The $2.3 million of income allocated to Mr. Musumeci is not being held by H2M for distribution in a subsequent year since the company is bankrupt and the K-1 is marked final.[9] Moreover, the member agreement stated Mr. Musumeci did not have any obligation to restore the capital account. If Mr. Musumeci had an obligation to contribute capital to H2M that was fulfilled by the $2.3 million

---

[9] To be clear, economic gain does not require actual distribution of the income. N.J.S.A. 54A:5-4. If income is left (reinvested) in the partnership, the income could constitute an economic gain. There can still be economic gain if some future event causes the income to be lost.

allocation, the Director would be in a better position to argue economic gain. See Koch, 157 N.J. at 4, 9 (despite personal liability on debt, zeroing-out of capital account on sale did not result in economic gain).

The Director asks the court to distinguish the present transaction from Koch on the grounds it is a liquidation, rather than a sale. Such a distinction does not make sense since it places a taxpayer who lost all his capital in a worse position than a taxpayer who had his capital returned. The transaction here is fundamentally similar to Koch. The economic reality is he did not gain (or lose) anything from this mere ledger transaction. "The result [sought by the Director] is flatly inconsistent with Koch's mandate that the New Jersey tax not be imposed on 'fictitious income.'" Moroney, 376 N.J. Super. at 12–13 (citing Koch, 157 N.J. at 9).

Taxing reported income when there is zero economic gain turns the ruling of the Supreme Court in Koch on its head and defies the legislative intent to tax economic gain. Koch, 157 N.J. at 9. Accessions to wealth are taxable. Ibid. A return of capital is not to be taxed since it is not an accession to wealth, but merely a return of what was put into a venture in the first place. Ibid. Here, there was not any capital to return, let alone an accession to wealth, since H2M went bankrupt.

A recovery of a past tax benefit is not implicated in this case. Some return of the capital or other economic benefit must be realized from the disposition of property to give rise to the recovery of a past tax benefit. For example, in Koch,

taxpayer Koch realized $125,000 for his share of the partnership. See generally Koch, 157 N.J. at 4-5. If Koch used $15,000 of his loss to offset other partnership income, Koch's basis would be reduced from $75,000 to $60,000. He would then be taxed on $65,000 of gain ($125,000 less $60,000) instead of $50,000, thereby recovering the tax benefit received. See Moroney v. Dir., Div. of Tax'n, 21 N.J. Tax 220, 229 (Tax 2004), aff'd, 376 N.J. Super 1 (App. Div. 2005) (applying concept and indicating "basis is reduced only to the extent a taxpayer uses [tax benefit] to offset income …"). See also N.J.A.C. 18:35-2.8 (Example 5: "Only losses used by [partnership] in reporting Regular Business Income reduce New Jersey basis each year:").

With zero liquidation proceeds, Mr. Musumeci did not receive any return of his capital. With no deficit restoration obligation, he did not derive any economic benefit from the allocated income. Without any return of capital nor economic benefit, there is not any recovery of a past tax benefit.

In enacting the Gross Income Tax, the Legislature sought to avoid hyper-technical application of tax codes and instead focus upon the economic reality of the transaction. See Smith, 108 N.J. at 30; Koch, 157 N.J. at 9. If the Director's interpretation is implemented, it would encourage the sort of mischief which the Legislature sought to avoid. Taxing a liquidation differently than a sale would only encourage straw sales to nominal entities (i.e., dummy corporations) for nominal

amounts to avoid the full brunt of the Director's proposed taxation of liquidation sales.

For the forgoing reasons, the assessment of additional taxation against Mr. Musumeci is vacated.